## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHON CHARLES LEONARD, On Behalf of Himself and All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>SCWORX CORP. and MARC S. SCHESSEL,<br><br>                    Defendants. | Case No. 1:20-cv-4777<br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Jonathon Charles Leonard ("Plaintiff"), on behalf of himself and all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, investigation of his counsel, which includes review and analysis of regulatory filings made by SCWorx Corp. ("SCWorx" or the "Company") with the United States Securities and Exchange Commission (SEC) as well as review and analysis of press releases, transcripts, media reports, analyst reports, and other publicly-available information.

## SUMMARY OF THE ACTION

1.      This is a securities fraud class action on behalf of all persons that purchased or otherwise acquired SCWorx securities between April 13, 2020 and April 17, 2020, inclusive (the "Class Period").  Plaintiff's claims arise under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      SCWorx describes itself as a provider of data content and services related to the repair, normalization, and interoperability of information for healthcare providers, as well as big data analytics for the healthcare industry.  Shares of SCWorx's common stock trade on the NASDAQ stock exchange under the ticker symbol "WORX."

3.      On April 13, 2020, SCWorx issued a press release entitled "SCWorx Announces First Installment of Purchase Order For 48 Million COVID-19 Rapid Testing Units Over Twenty-Four Weeks at $35 Million Dollars Per Week," which stated in part:

> SCWorx Corp. (WORX) announced today that it has received a committed purchase order from Rethink My Healthcare, a U.S.-based virtual healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week.

Under the Order, SCWorx will supply Rethink My Healthcare with IgM/IgG Rapid Detection Kits. SCWorx anticipates receiving the first 2 million rapid detection kits within approximately two weeks.

4.      On this news, the Company's share price skyrocketed from a previous close of $2.25 per share to $14.88 per share before later closing that day at $12.02 per share.

5.      It was not long before a securities analyst/short seller publicly questioned the deal. The next morning, on April 14, 2020, Utopia Capital Research issued a report doubting the validity of the Company's announcement, calling it "ludicrous," "very difficult to believe," and questioning its management's credibility in connection with the previous day's press release and earlier claims.  The report summarized the concerns as follows:

> It thus appears that members of management are no strangers to being involved/linked to securities laws violations [and] class action lawsuits for misleading investors. This should be of great concern when bearing in mind the outlandish claims made by the company over the last few weeks.

6.      On this news, SCWorx common stock closed down 30% at $8.45 per share on April 14, 2020.

7.      On April 15 and 16, 2020, SCWorx doubled down on its earlier announcement in an SEC Form 8-K and in an investor conference call, reaffirming the purchase commitment and identifying the Company's supplier of the test kits as ProMedical Equipment Pty Ltd. ("ProMedical").

8.      On April 17, 2020, however, Hindenburg Research issued its own report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely Bogus, Price Target Back to $2.25 Or Lower," which called into question the validity of the deal.  According to the report, ProMedical, (i) has a Chief Executive Officer (CEO) "who formerly ran another business accused of defrauding its investors and customers" and "was also alleged to have falsified his medical credentials," (ii) ProMedical claimed to the FDA and regulators in Australia to be

3

offering COVID-19 test kits manufactured by Wondfo, but "Wondfo put out a press release days ago stating that ProMedical 'fraudulently mispresented themselves' as sellers of its Covid-19 tests and disavowed any relationship," and (iii) the buyer that SCWorx claimed to have ordered the tests did not appear to be "capable of handling hundreds of millions of dollars in orders."

9.     On this news, the Company's share price fell $1.19, or more than 17%, over three consecutive trading sessions to close at $5.76 per share on April 21, 2020, on unusually heavy trading volume.

10.     On April 22, 2020, the SEC ordered that trading in SCWorx securities be suspended because of "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace."

11.     Thereafter, the Company reported that it had been "contacted by the U.S. Attorney's Office for the District of New Jersey, which is seeking information and documents from the Company's officers and directors relating primarily to the April 13, 2020 press release concerning COVID-19 rapid test kits."

12.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose to investors that: (i) SCWorx's supplier for COVID-19 tests had previously misrepresented its operations; (ii) SCWorx's buyer was a small company that was unlikely to adequately support the purported volume of orders for the COVID-19 tests; (iii) as a result, the Company's purchase order for COVID-19 tests had been misstated, overstated or entirely fabricated; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

4

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78 aa(c)).  Substantial acts in furtherance of the alleged fraud and/or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  In addition, the Company's principal executive offices are located in this District.

17.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

18.     Plaintiff Jonathon Charles Leonard, as set forth in the accompanying Certification, purchased SCWorx common stock during the Class Period, and suffered damages as a result of the fraud described herein.

19.     Defendant SCWorx is a Delaware corporation with its principal executive offices located at 590 Madison Avenue, 21st Floor, New York, New York.  SCWorx's common stock trades on the NASDAQ stock exchange under the symbol "WORX."

20.     Defendant Marc S. Schessel was the Company's founder, CEO and Chairman of the Board at all relevant times.  Schessel, because of his positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Schessel was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of his positions and access to material non-public information available to him, Schessel knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## DEFENDANTS' FRAUDULENT CONDUCT

21.     SCWorx describes itself as a provider of data content and services related to the repair, normalization, and interoperability of information for healthcare providers, as well as big data analytics for the healthcare industry.

22.     On Monday, April 13, 2020, prior to market open, SCWorx issued a press release entitled "SCWorx Announces First Installment of Purchase Order For 48 Million COVID-19 Rapid Testing Units Over Twenty-Four Weeks at $35 Million Dollars Per Week," which stated in part:

> NEW YORK, April 13, 2020 (GLOBE NEWSWIRE) -- ***SCWorx Corp. (WORX)*** ***announced today that it has received a committed purchase order from Rethink*** ***My Healthcare, a U.S.-based virtual healthcare network, for two million COVID-***

*19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week.*

*Under the Order, SCWorx will supply Rethink My Healthcare with IgM/IgG Rapid Detection Kits. SCWorx anticipates receiving the first 2 million rapid detection kits within approximately two weeks.*

"Widespread testing for COVID-19 disease in the United States is absolutely critical for saving lives and reopening our economy," said Marc Schessel, CEO of SCWorx. ***"Our substantial purchase order from Rethink My Healthcare will significantly increase the availability of rapid-test kits in the United States. Additional purchase orders currently under negotiation with certain other parties could further increase the U.S. supply of these important tests in the near term."***

About the IgM/IgG Rapid Detection Kit

The COVID-19 Corona Virus IgM/IgG Rapid Test is an in-vitro diagnostic test solely for the qualitative determination of COVID-19's IgM and IgG antibodies in human whole blood, serum, plasma and fingertip blood. This IgM/IgG Rapid Detection Kit is the world's first device that tests for both IgM and IgG antibodies with proven good clinical performance compared with RT-PCR.

Under regulatory guidelines, the Rapid Detection Kit is for professional use only and can be used in Centers for Disease Control and Prevention, Primary Health Care Institutions, Government Department / Public Institution State-Owned Enterprise / Large Company, Industrial Production Enterprise, Schools and/or Prison / Detention Center/ Drug Rehabilitation Center.

(Emphasis Added).

23.     On this news, the Company's share price skyrocketed from a previous close of $2.25 per share to $14.88 per share before later closing that day at $12.02 per share, on an astronomical volume of more than 96 million shares.

24.     The statements identified in ¶ 22 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors that: (i) SCWorx's supplier for COVID-19 tests had previously misrepresented its operations; (ii) SCWorx's buyer was a small company that was unlikely to adequately support the purported volume of orders for the COVID-19 tests; (iii) as a result, the Company's purchase order for COVID-19 tests had been misstated, overstated, or

entirely fabricated; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

25.     The next morning, on April 14, 2020, Utopia Capital Research—a self-described activist short-seller—issued a report questioning the validity of the Company's announcement, calling it "ludicrous," "very difficult to believe," and questioning its managements' credibility in connection with the previous day's press release and earlier claims.  The report further stated in part:

> It thus appears that members of management are no strangers to being involved/linked to securities laws violations [and] class action lawsuits for misleading investors. This should be of great concern when bearing in mind the outlandish claims made by the company over the last few weeks.
>
>        \*       \*       \*
>
> WORX's price run yesterday coincided with news that the company had received a "committed purchase order" from Rethink My Healthcare, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35M per week (6). This claim is very difficult to believe in light of the fact that the number of COVID-19 test carried out in the USA amount to only 298,499 since January 21, 2020 (7). How will Rethink My Healthcare sell all these tests is a very good question, especially as it is a company that specialises in virtual healthcare services with a somewhat underwhelming website (8). Yet this is not the only grandiose claim recently made by WORX's management. On March 27, 2020, the company claimed that its subsidiary sourced one million surgical masks for "existing large hospital customer", the hospital's name is not specified. (9) And on March 30, 2020, it announced that it had signed a new renewable annual data management contract with one of the Northeast's leading Cancer Institutes, once again the name of the customer is not specified (10).
>
>        \*       \*       \*
>
> WORX is not a good investment. The combination of: ludicrous claims made by management; a CFO named as a defendant in a class action lawsuit that the company settled; terrible financials; a merger involving thousands of shares purchased at a fraction of the current trading price; drastic share price and trading volume increases in a single day; and ongoing dilution, should be enough to make most people highly sceptical about purchasing this company's shares. Stay away from WORX unless you are an experienced trader.

26.     On this news, the price of SCWorx's common stock dropped $3.57 per share, closing down 30% at $8.45 per share.

27.     On April 15, 2020, SCWorx doubled down on its earlier announcement, reaffirming the purchase commitment on a "Business Update Call" with analysts and investors.  On the call, Defendant Schessel stated as follows:

> But I also mentioned testing. ***On Monday of this week, we announced receipt of a committed purchase order from Rethink My Healthcare, a U.S.-based telemedicine healthcare network, for two million COVID-19 Rapid Testing Units, with provision for additional weekly orders of 2 million units for 23 weeks, valued at $35 million per week.  Under the terms of the purchase order, we will supply Rethink My Healthcare with Point of Care IgM/IgG Rapid Detection Kits that provide immunoglobulin qualitative detection of IGM and IGG antibodies that are specifically generated by the body in response to the SARS COVI-2 infection - a kit targeting the specific antigens on the surface of the virus and providing a simple yes or no result within several minutes.*** Prior to this purchase commitment, I had been contacted by a multitude of hospitals, government agencies such as FEMA and folks representing the Federal prisons. With such an incredible demand I asked the hospitals in my buying group – hospitals like Partners Healthcare in Boston and the University of Vermont (who by the way have been deputized to purchase supplies for the entire state of Vermont) to assist me in testing these new point of care test kits among other products, quickly passing the kits to their labs and rapidly responding as to their effectiveness – this allowed me a streamlined product approval platform unheard of in normal operating conditions. ***I spent weeks researching over 30 product different lines, distributors, intermediaries until I found an actual manufacturer that had a kit that appeared to me at least to have all the attributes I was looking for – which were a very high sensitivity rating to blood samples, had the proper FDA authorizations under the emergency authorization act, was not a Chinese or South Korean manufacturer, was well on its way towards getting full FDA clearance and had enough capacity on his line where I could purchase 25% of his capacity with options to grow that over time. We anticipate receiving the first 2 million rapid detection kits in about two weeks and thereafter 2 million tests per week*** – with the full understanding from Rethink My Healthcare, that due to the incredible demand for these kits, until such a time where we can get more capacity, we would be splitting up its contract so that critically effected areas – such as the Federal Prisons could access these important items, albeit not in the quantity they require – however enough so that they can commence a program focused at first on the inmates and employees that need them the most – agreements that we are currently working through terms and procedurals.

(Emphasis added).

28.     On April 16, 2020, SCWorx filed a Form 8-K with the SEC, which was signed by

Defendant Schessel and which stated in part as follows:

> *Effective April 10, 2020, SCWorx, Corp., a Delaware corporation (the "Company"), accepted a purchase order ("Purchase Order") from Rethink My Healthcare ("RMH"), a U.S.-based virtual healthcare network, under which RMH has ordered and the Company is required to deliver two million COVID-19 Rapid Testing Units, at a per unit price of $17.50, with provision for additional weekly orders of 2 million units for 23 weeks (a total of 48 million units).*
>
> *On April 10, 2020, concurrently with its acceptance of the Purchase Order, the Company entered into a Supply Agreement ("Supply Agreement") with ProMedical Equipment Pty Ltd. ("Supplier") pursuant to which the Company agreed to purchase and the Supplier agreed to supply an aggregate of 52 million COVID-19 Rapid Testing Units over a six month period, comprised of 2 million units per week, at a per unit price of $13.00, commencing April 24, 2020.* Pursuant to the Supply Agreement, the Company is required to pay 50% down at the time of order placement, with the remaining 50% due upon completion of order and prior to shipping.

(Emphasis Added).

29.     The statements identified in ¶¶ 27-28 were materially false and/or misleading, and

failed to disclose material adverse facts about the Company's business, operations, and prospects.

Specifically, Defendants failed to disclose to investors that: (i) SCWorx's supplier for COVID-19

tests had previously misrepresented its operations; (ii) SCWorx's buyer was a small company that

was unlikely to adequately support the purported volume of orders for the COVID-19 tests; (iii) as

a result, the Company's purchase order for COVID-19 tests had been misstated, overstated, or

entirely fabricated; and (iv) as a result of the foregoing, Defendants' positive statements about the

Company's business, operations, and prospects, were materially misleading and/or lacked a

reasonable basis.

30.     On April 17, 2020, Hindenburg Research issued a report doubting the validity of

the deal, calling it "completely bogus," considering the CEO's checkered past, the questionable

credibility of supplier Promedical, and the relatively small size of Rethink My Healthcare.  In a

report entitled "SCWorx: Evidence Points to its Massive COVID-19 Test Deal Being Completely

Bogus, Price Target Back to $2.25 Or Lower," Hindenburg Research summarized its detailed

report, in relevant part:

- SCWorx, a nanocap company headquartered in a Regus rental office in New York City, recently announced it had entered into massive $35 million per week deal to buy and re-sell Covid-19 tests, causing its stock to surge 434%.

- SCWorx's CEO has a checkered past, including pleading guilty to felony tax evasion charges and paying a judgement in a lawsuit alleging he submitted fraudulent expense reports.

- The Covid-19 test supplier that SCWorx is buying from, Promedical, also is laden with red flags. Its CEO is a convicted rapist and formerly ran another business accused of defrauding its investors and customers. The CEO was also alleged to have falsified his medical credentials.

- Promedical claimed to the FDA and regulators in Australia to be offering COVID-19 test kits manufactured by large, well-respected Chinese firm Wondfo.

- Wondfo put out a press release days ago stating that Promedical "fraudulently mispresented themselves" as sellers of its Covid-19 tests and disavowed any relationship. We spoke with Wondfo and confirmed there was never any relationship.

- Meanwhile, the buyer that SCWorx has lined up for up to $840 million dollars in tests is a virtual healthcare company started by a 25-year-old in August 2018 that looks modestly sized, with only 3 employees and 3 consultants/advisors listed on its team page–hardly the major partner that we believe would be capable of handling hundreds of millions of dollars in orders.

- Obviously, we believe the Covid-19 hype surrounding SCWorx is completely bogus and we predict shares will soon return to the $2.25 price level they were at prior to the hype.

- We also think shares risk being halted and ultimately could move far lower than $2.25 if/when regulators investigate the company's potentially nefarious business practices at a time when our country and its citizens are arguably at their most vulnerable. We're offended by how egregious this appears, not only as investors, but as Americans.

(Emphasis added.)

11

31.     On this news, the Company's share price fell $1.19, or more than 17%, over three consecutive trading sessions to close at $5.76 per share on April 21, 2020, on unusually heavy trading volume.

32.     On April 22, 2020, the SEC ordered that trading in the securities of the Company be suspended because of "questions and concerns regarding the adequacy and accuracy of publicly available information in the marketplace"  As of the filing of this Complaint, trading remains halted.

33.     On April 23, 2020, Robert Christie resigned from SCWorx's Board of Directors.

34.     On April 29, 2020, SCWork's Chief Operating Officer, James Schweikert, "was terminated by mutual agreement."

35.     Thereafter, the Company reported that it had been "contacted by the U.S. Attorney's Office for the District of New Jersey, which is seeking information and documents from the Company's officers and directors relating primarily to the April 13, 2020 press release concerning COVID-19 rapid test kits."

## CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired SCWorx securities between April 13, 2020 and April 17, 2020, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

37.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, SCWorx's common stock actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Tens of millions of shares of SCWorx common stock were traded during the Class Period on the NASDAQ exchange.  Record owners and other members of the Class may be identified from records maintained by SCWorx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in securities class action litigation.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of SCWorx; and

(c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

41.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

42.      The market for SCWorx's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements, and/or failures to disclose, SCWorx's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired SCWorx's securities relying upon the integrity of the market price of the Company's securities and market information relating to SCWorx, and have been damaged thereby.

43.      During the Class Period, Defendants materially misled the investing public, thereby inflating the price of SCWorx's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about SCWorx's business, operations, and prospects as alleged herein.

44.      At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the

14

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SCWorx's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed over time.

## LOSS CAUSATION

45.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.     During the Class Period, Plaintiff and the Class purchased SCWorx's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere here in in detail, Schessel, by virtue of his receipt

of information reflecting the true facts regarding SCWorx, his control over, and/or receipt and/or modification of SCWorx's allegedly materially misleading misstatements and/or his associations with the Company which made him privy to confidential proprietary information concerning SCWorx, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

48.    The market for SCWorx's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, SCWorx's securities traded at artificially inflated prices during the Class Period.  On April 13, 2020, the Company's share price closed at a Class Period high of $12.02 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of SCWorx's securities and market information relating to SCWorx, and have been damaged thereby.

49.    During the Class Period, the artificial inflation of SCWorx's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about SCWorx's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of SCWorx and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed over time, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50.     At all relevant times, the market for SCWorx's securities was an efficient market for the following reasons, among others:

(a)     SCWorx shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, SCWorx filed periodic public reports with the SEC and/or the NASDAQ;

(c)     SCWorx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     SCWorx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for SCWorx's securities promptly digested current information regarding SCWorx from all publicly available sources and reflected such information in SCWorx's share price.  Under these circumstances, all purchasers of SCWorx's securities during the Class Period suffered similar injury through their purchase of SCWorx's securities at artificially inflated prices and a presumption of reliance applies.

52.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

17

information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

53.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of SCWorx who knew that the statement was false when made.

## FIRST CLAIM FOR RELIEF
### Violation of § 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against SCWorx and Schessel

54.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

55.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase SCWorx's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

56.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for SCWorx's securities in violation of § 10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

57.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SCWorx's financial well-being and prospects, as specified herein.

58.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

19

of conduct as alleged herein in an effort to assure investors of SCWorx's value and performance and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about SCWorx and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

59.     Schessel's primary liability and controlling person liability arises from the following facts, among others: (i) Schessel was a high-level executive and director at the Company during the Class Period and member of the Company's management team and had control thereof; (ii) Schessel, by virtue of his responsibilities and activities as a senior officer and director of the Company, was privy to and participated in the negotiation, creation, development, and reporting of the Company's contracts, plans, projections and/or reports; (iii) Schessel had access to other members of the Company's management team, contracts, internal reports, and other data and information about the Company's contracts, agreements, finances, operations, and sales at all relevant times; and (iv) Schessel was aware of and participated in the Company's dissemination of information to the investing public which he knew and/or recklessly disregarded was materially false and misleading.

60.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing SCWorx's financial well-being and prospects from the

investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, operations, financial well-being, and prospects during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

61.     As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of SCWorx's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired SCWorx's securities during the Class Period at artificially high prices and were damaged thereby.

62.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true and not misleading. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding SCWorx's business, operations, and prospects, which were not accurately disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their SCWorx securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

63.     By virtue of the foregoing, Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

64.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM FOR RELIEF
### Violation of § 20(a) of the Exchange Act
### Against Schessel

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     Schessel acted as a controlling person of SCWorx within the meaning of § 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions and his ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false and misleading statements made by himself and the Company and disseminated to the investing public, Schessel had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  Schessel was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to these statements being issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67.     In particular, Schessel had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions and statements giving rise to the securities violations as alleged herein, and exercised the same.

22

68.     As set forth above, SCWorx and Schessel each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Schessel is liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: June 22, 2020                    Respectfully submitted,

**JOHNSON FISTEL, LLP**

*/s/ Ralph M. Stone*
Ralph M. Stone (RS-4488)
1700 Broadway, 41st Floor
New York, NY  10019
Tel. (212) 292-5690
Fax (212) 292-5680
RalphS@johnsonfistel.com

MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Tel.: (470) 632-6000
Fax: (770) 200-3101
MichaelF@johnsonfistel.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: 6132D2AF-AB45-4780-839E-533D87EE56CC

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Jonathon Charles Leonard, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 4/13/20 | 9,000 | 14.2272 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 4/16/20 | 9,000 | 6.4266 |

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

DocuSign Envelope ID: 6132D2AF-AB45-4780-839E-533D87EE56CC

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of June 2020.

Jonathon Charles Leonard